[No. 1848.   Decided January 27, 1896.]

ALBERT JOHN ROTH, *Respondent*, v. THE UNION DE-
POT COMPANY, *Appellant.*

RAILROADS — INJURY TO PERSONS ON TRACK — LIABILITY FOR NEGLI-
GENCE — IMPUTED NEGLIGENCE — EXCESSIVE DAMAGES.

Where the public have been in the habit for a long time of using,
at a point not in a traveled public highway, the right-of-way of a
railroad as a path in passing from one part of the city to another,
and the railroad company has knowledge of the fact that its right-
of-way was so traveled by the public at almost every hour of the
day, its acquiescence in the public use amounts to a license to so
use its right-of-way, and imposes the duty upon it to exercise reas-
onable care in the movement of its trains so as to protect from in-
jury all persons crossing or traveling its tracks at that point. (HOYT,
C. J., dissents).

A child of tender years cannot be held to the same degree of care
in avoiding danger as a person of mature years and accumulated
experience.

The negligence of the parent cannot be imputed to the child in
an action brought for the benefit of the child and not for the benefit
of the parent.

A verdict of $15,000 for injuries to a child of nine years of age
necessitating the amputation of one of his legs, is not excessive.

Appeal from Superior Court, Spokane County.—
Hon. JAMES Z. MOORE, Judge.   Affirmed.

*W. W. Cotton, J. M. Ashton,* and *Lester S. Wilson,*
for appellant.

*D. W. Henley,* and *Fenton & Saunders,* for respondent.

The opinion of the court was delivered by

DUNBAR, J.—The defendant is a railway terminal
company in the city of Spokane.   Its railway tracks
and yards lie parallel with the Spokane river near its
north bank in that city.   North of the defendant com-
pany's yards and tracks there is an addition to Spokane

city on which lived, at the time the accident alleged in this case occurred, a number of families, variously estimated in the testimony at from twenty-five to fifty. The railway lines and switches of the appellant ran in a westerly direction across Washington street, at a right angle therewith and near the north bank of and parallel with the Spokane river, and ran northerly from Washington street; thence in a northwesterly direction, making a short curve around a high bluff of rocks; and thence in a straight line to and beyond the east line of Mill street of said city extended north. At a point east of the east line of Mill street so extended, the appellant had located a switch, from which diverged several side tracks running parallel with each other in an easterly direction around said sharp curve. The railway tracks on the said switches were located on a down grade from Mill street in an easterly direction around the said sharp curve, and cars detached from an engine above the switches would by reason of the down grade run of their own momentum down to and across Washington street at a rapid speed. For many years before the construction of appellant's yards at this point the people residing north of the appellant's right of way were in the habit of using several foot paths which converged into a well defined path as they reached the appellant's right of way near Howard street, and the people residing between Washington street and Mill street were accustomed to go to the south side of the river by these foot paths which converged into one path near Howard street, and thence directly down the right of way of the appellant to Washington street; and there was also a path leading across the tracks of appellant running along the north bank of the river to Washington street, but after the construction of appellant's tracks the path

leading from the tracks along the north bank of the river was abandoned as a foot path and the people residing north of the tracks, after reaching the tracks, used the right of way of the company until they reached Washington street, it being a more convenient and shorter route to the city than any other way they could travel. It is insisted by the respondent, and the testimony shows without any doubt, that the appellant and its servants and agents operating their cars at this point knew of the existence of this foot path, and that the people of all ages residing to the north of the track were accustomed at almost every hour of the day to use this foot path and the right of way of appellant from the point where the path entered the right of way to Washington street; that it was not only used by the people who lived north of the tracks, but that it was used indiscriminately.

On the 12th day of April, 1892. the plaintiff and respondent, Albert John Roth, a boy of nine years of age, while going down through this path on the right-of-way of appellant, was knocked down by a car, the wheels of which passed over one of his legs, crushing it so that amputation of that limb became necessary. It seems that the appellant's agents in switching the cars sometimes, when help was short, instead of sending an engine down with the empty car, would, in railroad parlance, "kick" the car and let it go down the track unattended by a brakeman; that it was not the usual way to send the cars unattended by a brakeman, but that they sometimes did so, and it is conceded that that was the manner of switching the cars at the time of this accident. It seems that, at the same time that the respondent, who was in company with his sister, and another boy about his own age, came down the path, two cars were "kicked" down

the track behind them on appellant's tracks, and respondent, in order to avoid being injured by one of these cars, started to cross one of the tracks, and in doing so was run over by a car going down the track which he was attempting to cross.   By reason of the close proximity of these cars he became confused and in attempting to escape from one, was run down by the other.   Neither of these cars was attended by any person, but they were "kicked" down through the cut around the sharp curve, out of sight of the employees who "kicked" them, and they acquired a considerable speed by reason of the down grade of the track. It is conceded that there was no brakeman or any person along the track to look out for the cars or to warn any person who might be on the trackway of danger. The respondent, at the time of the injury, lived with his father and mother north of the track, and was accustomed daily to go to the south side of the river to sell newspapers to support himself and his family.  An action was brought in his interest, by Frank Roth, his guardian *ad litem*, and a verdict was rendered for $15,-000 damages.   Judgment followed, and an appeal has been taken to this court.

The overwhelming weight of testimony is to the effect that for three or four years immediately preceding this accident, it had been the custom of the people north of the track, and of others, to use this right of way as a foot path; that from fifty to one hundred people passed over it daily; that this custom was known to the appellant; that it made no objection to it, and that it posted no notices warning people not to travel upon the path.   There was some little testimony offered in defense to the effect that people had been told not to go through there, but this was a question of fact which was submitted to the jury, and un-

der the testimony they were amply justified in coming
to the conclusion that the travel was as alleged by the
respondent.   This condition of things was testified to
not only by numerous citizens but by many of the
employees of the company, or men who were em-
ployees during that time.  One witness testified: " They
used it just about the same as you would a sidewalk."
Another, that persons traveling over this route could
be seen every hour in the day.   Witness L. N. Davis,
who had worked for the company and who lived in
that neighborhood, testified:   " Well, there is people,
most all the time you would look out, traveling; es-
pecially at train time you would see them, all kinds
of ways, going; see them taking little wagons, haul-
ing trunks through there, and baby carriages and
everything."   This witness testified that that was the
main pathway of all the people north of the track.
So that the essential question in this case is:   Was
the respondent a licensee or a trespasser at the time
he was traveling on the appellant's right of way, or
does an acquiescence by a railway company in travel
on its right of way imply a license; for it is an ad-
mitted fact in this case that the respondent was not
there by special invitation of the appellant; that he
was not there for the benefit of the appellant, but that
he was there simply for his own convenience and
pleasure.

A number of cases are cited by the appellant to sus-
tain the contention that, notwithstanding the fact that
a railroad company acquiesces in such travel by the
public, and does not take any steps to stop them, no
implied consent to such use is established, and that
such acquiescence does not vary the company's duties
as to trespassers; and it may be conceded at the out-
set that a railroad company does not owe any duty to

34 — 13 WASH.

a trespasser, for there is no presumption that a trespasser or a person without consent, actual or implied, will be upon the track.

We have carefully examined the cases cited by the appellant and a majority of them we think can be easily distinguished from the case at bar.

The case of *Chenery v. Fitchburg R. R. Co.*, 160 Mass. 211 (35 N. E. 554), was an action for running down the plaintiff at a point on defendant's track where it was crossed by a private way along which she was traveling. The court instructed the jury that as a matter of law, if people were accustomed to cross a railroad track at a certain place, and the company made no objection, license from the company was implied, and that such a license imposed a duty to use reasonable care to protect the crossers; and the court in that case simply held that this was a question of fact for the jury to determine.

The *Louisville, etc., Ry. Co. v. Phillips*, 112 Ind. 59 (13 N. E. 132, 2 Am. St. Rep. 155), was a case where a track was laid upon a public street, and the court held that the rights of the public and the railroad company respecting the use thereof were mutual, though those of the latter were paramount; that a person was not a trespasser who walked along such track, and if in so doing his foot became fastened in an opening which existed by reason of the negligent construction of the track, and he was run upon by a train of the railroad company which was negligently managed, he being without fault, the railroad company was liable for the injury sustained. This was what was decided in this case, though the court indulged in a general discussion of the subject involved in the present case, and said that on the hypothesis that the place where the person received his injury was exclusively the roadway

of the company, something must be superadded to the negligence of those in charge of the train in order to justify a recovery, and that a trespasser had no right to exact care from a railroad company. The question of license or acquiescence did not arise in that case and was not discussed, and we can see nothing in the case, either of dicta or decision, which bears upon the case at bar.

In *Mo. Pac. Ry. Co. v. Brown*, (Tex.) 18 S. W. 670, the court held that evidence that a person had been in the habit of traveling on a track, and that the engineer had seen persons on that part of the track, but no more frequently than on other parts of the track similarly situated, and that no measures had been taken to prevent such use of the track, was not sufficient to establish a license to the public to use the track. In that case the locality was remote from any station, and the court especially announced in its decision this fact and the further fact that there was nothing in the facts of the case to show that the company assented to or knew of the use of the track by others, and that the facts of that particular case were not sufficient to establish an implied consent to the use of the track on which a license could be assumed to have existed, and the further fact that there was nothing in the testimony to show any acts of negligence on the part of the appellants, but on the contrary that it showed an entire absence of negligence; a different case from the one under discussion, where the track was in a thickly settled locality, and where a uniform travel by the public had been established for a period of from three to four years. Persons are seen not infrequently by engineers traveling on tracks in country places and in districts where frequent travel is necessarily impossible, and of course the

knowledge that a person occasionally traveled upon a track in such a place as that would not be sufficient to establish a license to the public generally; and that is all that was decided in that case.

*Cent. R. Co. v. Brinson*, 10 Ga. 207, seems to be a mis-citation as the case is not reported in that volume.

*Gaynor v. Old Colony, etc., Ry. Co.*, 100 Mass. 208 (97 Am. Dec. 96), simply decides that this is a question for the decision of the jury.

In the case of *Philadelphia & Reading R. R. Co. v. Hummell*, 44 Pa. St. 375 (84 Am. Dec. 457), there is no question of license or acquiesence discussed. The court held, in rather rabid language, that there was an intrusion upon the rights of the railway company; that the company had no reason to suppose that either man, woman or child might be upon the railroad where the accident happened; that it had a right to presume that no one would be upon it, and to act upon the presumption. The main contention there was that the company did not blow the whistle of the locomotive; the court held that they were not bound under the circumstances of that case to do so. But this case is mentioned and distinguished by other subsequent cases in Pennsylvania, which hold that a license could be established by acquiescence.

*Davis v. Central Cong. Society*, 129 Mass. 367 (37 Am. Rep. 368), was a case where a woman had been invited to attend a meeting held at a house of worship and was injured by reason of the dangerous condition of the society's premises, and the court held that whether the plaintiff was in the exercise of due care or whether the way was reasonably safe, were questions of fact for the jury. The case in no way bears upon the case under discussion.

*Benson v. Baltimore Traction Co.*, 77 Md. 535 (26 Atl.

973, 39 Am. St. Rep. 436), was a case where the principal of a school had asked permission for a class of students to visit the company's power house for the purpose of viewing the machinery, and in passing through the power house one of the students fell into a vat of boiling water; and it was there very properly held that the traction company was under no obligation to especially provide against accidents. The court in its discussion of the question quotes the case of *Hounsell v. Smyth*, 7 C. B. (N. S.) 738, which case is quoted in several subsequent cases, where the court said: "Suppose the owner of land near the sea gives another leave to walk on the edge of the cliffs, surely it would be absurd to contend that such permission cast upon the former the burden of fencing." But this case can have no bearing upon the question discussed here. It certainly would not impose the burden of fencing, but if, after he had given a person permission to walk on the edge of the cliffs where there was a single path, and no way of escape from it accessible, he had sent a blind car down the path after him, a different liability might reasonably have been established.

*Plummer v. Dill*, 156 Mass. 426 (31 N. E. 128, 32 Am. St. Rep. 463), decided that where a woman went to a building for her own convenience to inquire about a matter which concerned herself alone, she could not recover from the owner of the building for injuries received by striking her head upon a projecting sign placed on a post at the corner of the landing. This case seems to us clearly not to be in point.

*Gibson v. Leonard*, 143 Ill. 182 (32 N. E. 182, 36 Am. St. Rep. 376), was a case where the members of a fire patrol forced open the door of a building then on fire and entered the main floor and basement, and while

using an elevator the rope broke and one of the patrolman was injured. The owner of the building was not present and did nothing to induce the entry. The court held that the owner of the building was not liable to the party injured, although the elevator and its appliances were not safely constructed and maintained. The court in its opinion says:

"There is nothing in the case to indicate an invitation, either express or implied, to either enter the premises or use the elevator, and there being no invitation or inducement on the part of the appellee, no duty was imposed upon him to leave the elevator in such condition, when the building was closed at night, as that it could be operated with safety."

It would seem that it would be stretching the law to hold that the owner of a building would reasonably contemplate an emergency such as the burning of the house, and that by reason of the contemplation of such emergency, he should be held to have invited the patrolmen to use a dangerous appliance.

The case of *Baltimore & O. R. R. Co. v. Schwindling*, 101 Pa. St. 258 (47 Am. Rep. 706), involves no question of license.

The case of *Wright v. Boston, etc., R. R. Co.*, 142 Mass. 296 (7 N. E. 866), may tend to support the contention of the appellant, though it does not very clearly appear from the opinion what the real circumstances of the case were, or what the court would have held under the circumstances of this case.

The case of *Illinois Central R. R. Co. v. Godfrey*, 71 Ill. 500 (22 Am. Rep. 112), seems to decide squarely in favor of the appellant's contention that the simple acquiescence of a railroad company in the use of its track or right of way, by persons passing along it, as a foot way, does not give such person a right of way

over the track, and does not impose upon the company the duty of protecting or providing safeguards for persons so using its grounds; and this case was followed by the supreme court of Illinois in the case of *Blanchard v. Lake Shore, etc., R. R. Co.*, 126 Ill. 416 (18 N. E. 799, 9 Am. St. Rep. 630); and the supreme court of Maryland in the case of *B. & O. R. R. Co. v. State of Maryland to the use of Allison, etc.*, reported in 19 Am. & Eng. R. Cas. 83. These cases hold that the relative rights of the railroad company and the injured party are not changed by reason of the acquiescence on the part of the company in the use of its track or right of way, and it follows from the logic of the cases that the company would be held responsible only for such gross negligence as indicated wilfulness. The case in 71 Ill. 500, cites, in support of its conclusion, the case of *Philadelphia & Reading R. R. Co. v. Hummell, supra*, and *Gillis v. Penn. R. R. Co.*, 59 Pa. St. 129 (98 Am. Dec. 317). We think the Illinois supreme court mistook the logic of those cases, and such was the opinion of the supreme court of Pennsylvania, which reviewed the *Hummell* and *Gillis* cases in the case of *Kay v. Penn. R. R. Co.*, 65 Pa. St. 269 (3 Am. Rep. 628), and in some subsequent cases, and distinguished them from a case where license by user had been established.

Probably the strongest case supporting the views contended for by the appellant is the case of *Glass v. Memphis & C. R. R. Co.*, 94 Ala. 581 (10 South. 215), where it was held that the fact that persons living in the neighborhood of a railroad track are accustomed to walk upon the track without objection of the company does not make them any the less trespassers; that where such track is used without the direct consent of the company, the company could be held only

for negligence amounting to wantonness, or an intention to inflict injury; and further held that such wantonness and intention could not be inferred unless the employees actually knew of the peril of the decedent and failed to make reasonable effort to avert it. We think that all the cases cited can be distinguished possibly from the case at bar, so far as the doctrines announced are concerned, excepting this one, and this court, we think, went too far in holding that wantonness could not be inferred, unless the peril of the decedent was actually known to the employees of the company.

Conceding for the moment the doctrine that the plaintiff in this case was a trespasser, and conceding further that the defendant could be held only for gross negligence, we think the circumstances of this case did most emphatically indicate gross negligence, and we are of the opinion that under the circumstances of the case the defendant ought to be held to have presumed that when it threw a car out of its sight around a curve on a down grade in a thickly settled community where it had knowledge that its track was used by from fifty to a hundred people a day, somebody's life would be imperiled by this careless mode of switching its cars; and that it carelessly and wantonly placed itself in a position where it could not see the peril of the passers by. The evidence shows that it was not its general custom to switch its cars in this way, but that it did so only occasionally when short of men. The rule as laid down by many writers is that such a duty is imposed upon a railroad company in operating its trains as would be imposed upon an honest man in the transaction of his business. It seems to us that no honest or humane person would be guilty of transacting his business in the reckless

manner in which the appellant in this case transacted his. Duties are relative, and that which would not be a duty under certain conditions would become a most imperative duty under others. The people of modern times hold life and limb in too high regard to allow them to be weighed in the scale with mere convenience or selfish property interests. This is the sentiment of humanity, and a sentiment which ought to be reflected by the decisions of the courts. This appellant, to save the expense of an employee for a few minutes, hurled not only one but two blind cars down this right of way, regardless of the fact, which it must have known under the circumstances as shown by the testimony, that they were liable to cause the death or permanent injury of some one; and we think that this fact alone establishes gross and wilful negligence, notwithstanding the fact that none of the employees saw the danger of the plaintiff in this case; and, of course, under all the authorities, a railroad company is not allowed to run down and destroy a naked trespasser who is upon its track, but is held to be responsible for an attempt to prevent his injury after his peril is discovered.

Very much more in accordance with the plainest principles of humanity was the doctrine announced in *Railroad Co. v Donovan*, 84 Ala. 141 (4 South. 142), viz., that those who are operating a railroad in a town or city, or through a thickly populated district where there is occasion for people to pass along the track, and a usage to that effect, owe the duty of keeping a vigilant lookout for such persons at such places. See also *Glass v. Memphis & C. R. R. Co.*, *supra*.

The two Illinois cases which we have just noticed seem to have lost sight of the doctrine of comparative negligence, which was announced by the supreme

court of Illinois in the case of *Illinois Central R. R. Co. v. Hammer*, 72 Ill. 347, and the opinion in 71 Ill. 500, *supra*, must be construed somewhat with reference to the principles enunciated in the later case, where it was held that, while it was negligence for a person to travel on the track of a railroad at its depot grounds, where everybody had notice that cars were constantly passing and engines switching cars, it was also negligence on the part of the company to have flying switches passing on a track without an engine attached or a bell ringing or a whistle sounding, and where both parties were at fault in these respects it was for the jury to determine under all the circumstances whether the negligence of the plaintiff was slight and that of the defendant gross; and if the negligence of the plaintiff was slight and that of the defendant gross, that the plaintiff could recover. The court in that case announced that the rule had not been at all times accurately stated, and that inadvertently courts had laid down the rule that a plaintiff who was guilty of negligence could not recover, but that the true rule was that he could recover, notwithstanding his negligence, if his negligence had been slight and that of the defendant gross; that where persons go upon or pass over the grounds connected with railroad depots, they are presumed to know that the place is dangerous, and hence are required to use care and prudence commensurate with the known dangers of the place; but that, on the other hand, the servants of the company knowing that it is a place where persons are constantly passing, their duty to exercise caution and prudence is also enhanced.

"In such places," says the court, "they must use more effort and precaution for the preservation of life and limb than at places where persons have no right

to be, and the employees have no right to expect to find them. Whilst the great commercial and business interests of the country demand their protection, still the lives and personal safety of persons are paramount. All other considerations must yield to this, the first and greatest and most important of all rights for which governments are organized and laws enacted."

The court does not stop with the announcement that they must use more effort for the preservation of life and limb at such places than at places where persons have no right to be, but coupled with that is the further provision that they must use more precaution than at places where they have no right to expect to find persons. In the case at bar they did have a right to expect to find people on this track where these two insensate objects were sent without control, notwithstanding the fact that people had no legal right to be there.

In opposition to the doctrine announced by these few cases, however, we cite first the case of *Kay v. Pennsylvania R. R. Co.*, 65 Pa. St. 269 (3 Am. Rep. 628), where it was held directly that the company had the right to detach cars and send them on without a brakesman, out of sight around a curve; but that this would be different when, by license to others and by sufferance, they permitted the public to enjoy a privilege of passage which would bring them into danger. It is true that in this case certain privileges were granted over the right of way to certain persons, for the purpose of unloading and shipping lumber, but this privilege was not granted to the plaintiff nor to the public in general, and cannot affect the principles announced in the decision. This was a case where a woman carried her nineteen months' old child with her to where she went to wash, near the railroad track. After having crossed over the track to get some water,

she set the child down before a chair and engaged again in washing.    In three or four minutes she missed the child; it had strayed upon the track and was run over by a lumber car, which was detached and sent around a curve in the siding, on a slight down grade, unattended by a brakesman.    Both of the child's arms were so crushed that they had to be amputated.

"Conceding the right of the railroad company," said the court, " to the exclusive use of its tracks over the lot,   .   .   .   the true question is whether the circumstances created a different duty.   The ownership of the lot gave to the company the right to use it as most convenient and expedient in moving its cars; and no one can gainsay the right to detach and send cars ahead without a brakesman, even out of sight and around a curve.   But the case is altered when, by a license to others, they have devoted this ownership to a use involving their interests and their safety; and by sufferance permitted the public to enjoy a privilege of passage which might bring their persons into danger."

The court then, after noticing the fact that the way was used to unload lumber, proceeds to say:

"It also suffered its tracks to be used by the neighboring population as a way across the lot from one part of the city to another.   .   .   .   The presumption of a clear track at this place could not reasonably arise, .   .   .   but greater precaution against injury to those thus permitted to use the lot and the tracks of the company became a duty."   .

And in speaking of the negligence in sending the car round the curve where people were liable to pass, the court said:

" Its only purpose was to save a few hundred feet of travel to the engine, by detaching it from the car when in motion, and stopping the engine before it reached the switch, in order to permit it to run forward on the

main track to hitch on to other cars. To save this short time and distance a life was periled and a serious injury inflicted."

And the court, as we have before indicated, in reviewing the instructions of the court below who relied upon the cases of *Phil. & Reading R. R. Co. v. Hummell,* and *Gillis v. Pa. R. R. Co., supra,* distinguished those cases from the case then under consideration, and found that the trial court had erred in applying the principles enunciated in those cases to the case at bar; and in quoting from the language of the court in the *Hummell* case this expression, "precaution is a duty only so far as there is reason for apprehension," says that that is the very feature which distinguished that case from the case under discussion. So, in this case, accepting that maxim, that "precaution is a duty only so far as there is reason for apprehension," and applying it to the circumstances of this case, it must be convincing to the mind of every reasonable person that there was reason for apprehension that a car, thrown around this curve unattended, under the circumstances of the travel proven, would do incalculable damage to some traveler.

*Hooker v. Chicago, etc., R. R. Co.,* 41 Am. & Eng. R. Cas. 498 (44 N. W. 1085), was a case where a woman was walking across a high trestle, accompanied by two children. It was conceded that she was not there in the interest or for the benefit of the railroad company, but that she was there simply for the purpose of amusing and entertaining the children, and that they had to walk across this bridge or trestle on ties. While on the bridge they were overtaken by a passing train and were all killed. The testimony tended to prove that the bridge for many years and up to the time of the accident had been habitually and constantly used

by men, women and children going back and forth through that part of the city, as a foot pathway, without any objection or warning by the company that it should not be so used, until after the accident. The court held that, by reason of said acquiescence in the travel of the public, Mrs. Dacey, who was using the bridge with the children, was not a trespasser; that she was using it properly and lawfully, and that the defendant should be held to the ordinary rule of negligence.

In *Swift v. Staten Is. R. T. R. Co.*, 45 Am. & Eng. R. Cas. 180 (25 N. E. 378), a New York case, it was held that the acquiescence of a railroad company in the habit of certain persons crossing its track at a place not a public highway, amounts to a license, and imposes a duty upon the company as to all persons so crossing to exercise reasonable care in the running of its trains so as to protect them from injury; that the sufficiency of the warning required at such crossings is a question for the jury. The court, in the course of its opinion, says:

"The legal principles applicable to the facts appearing here have been frequently enunciated by this court to the effect that where the public have, for a long time, notoriously and constantly, been in the habit of crossing a railroad at a point not in a traveled public highway, with the acquiescence of the railroad company, such acquiescence amounts to a license, and imposes a duty upon the company, as to all persons so crossing, to exercise reasonable care in the running of its trains, so as to protect them from injury."

It will be noticed that in these last two cases there is no question of any affirmative action on the part of the companies in granting licenses to people to travel on their tracks, but the decisions were based squarely upon the doctrine of acquiescence.

In the case of *Troy v. Cape Fear & Y. V. R. R. Co.*, 34 Am. & Eng. R. Cas. 13 (6 S. E. 77), the same principle was decided, and the court there, in discussing the proposition and noting the contention of the defendant that the plaintiff's intestate was a trespasser in being wrongfully on the track, and that the injury was the result of his own wrong — in which case *Bacon v. R. R. Co.*, 15 Am. & Eng. R. Cas. 409, was cited — said:

"We think that, upon a careful examination of the cases cited by counsel for the appellant, it will be found that in the most of them the injury was the result of the contributory negligence of the party injured, proximately causing it, and not resulting directly from the negligence of the defendant; and where they have gone beyond this, they are not in accord with the rulings of this court, nor in harmony with the current of authority;" citing *Byrne v. R. R.*, 104 N. Y. 362 (58 Am. Rep. 512), where it was said: "That when the public for a series of years had been in the habit of crossing the railroad, the acquiescence of the defendant in the public use amounted to a license or permission to cross at the point, and imposed the duty upon it, as to all persons so crossing to exercise reasonable care in the movement of its trains, so as to protect them from injury."

To the same effect are: *Kelly v. So. Minn. Ry. Co.*, 28 Minn. 98 (5 N. W. 588); *Barry v. N. Y. Cen., etc., R. R. Co.*, 92 N. Y. 289 (44 Am. Rep. 377); *Phil. & Reading R. R. Co. v. Troutman*, 6 Am. & Eng. R. Cas. 117; *Taylor v. Delaware, etc., Canal Co.*, 113 Pa. St. 162 (8 Atl. 43, 57 Am. Rep. 446).

In the last mentioned case, the court quoting from *Barry v. Railroad Co.*, 92 N. Y. 289 (44 Am. Rep. 377), said:

" The company had a lawful right to use the tracks for its business, and could have withdrawn its per-

mission to the public to use its premises as a public way, assuming that no public right therein existed; but, so long as it permitted the public use, it was chargeable with knowledge of the danger to human life from operating its trains at that point, and was bound to such reasonable precaution in their management as ordinary prudence dictated to protect wayfarers from injury. . . . The company [in such case], is an actor at the time in creating the circumstances which imperil human life, and it would be alarming doctrine that it was under no duty to exercise any care in the movement of its trains.''

See, also: *Delaney v. M. & St. P. Ry. Co.*, 33 Wis. 67; *Davis v. C. & N. W. Ry. Co.*, 58 Wis. 646 (17 N. W. 406, 46 Am. Rep. 667); *Townley v. C. M. & St. P. Ry. Co.*, 53 Wis. 626 (11 N. W. 55); *Barry v. N. Y., etc., R. R. Co.*, *supra.*

In fact, the overwhelming weight of authority seems to be to the effect that acquiescence creates a right which imposes upon the railroad companies the duty of ordinary diligence; and as the instructions of the court on this proposition were all based upon this theory, and the objections to such instructions were based upon the opposite theory, it is not necessary to specifically review them. It is sufficient to say that we think the instructions were given in accordance with the great weight of authority.

And the instruction in regard to contributory negligence we think was also properly given. By the overwhelming weight of authority a distinction is made between the responsibility of a child and that of an adult. It seems to us that it would be a monstrous doctrine to hold that a child of inexperience — and experience can come only with years — should be held to the same degree of care in avoiding danger as a person of mature years and accumulated experience. In the simplest transactions of life we recognize this

distinction. It is recognized by the law in all the turntable cases. It was recognized by this court in the case of *Ilwaco Ry. & Nav. Co. v. Hedrick,* 1 Wash. 446 (25 Pac. 335), where it was held that the testimony of the company that it had been in the habit of leaving the turntables unlocked (in an action against such company for the death of a child of tender years) was not admissible. No court would hold that an adult, who would deliberately put his feet down between the wall and a turntable when it was in motion, so that they would be ground off, was not guilty of contributory negligence. His experience would naturally teach him better. But everybody, and especially people who are employing dangerous agencies, must deal with children just as they are, and must take notice of their lack of judgment and lack of experience. The care or caution required is according to the capacity of the child, and this is to be determined ordinarily by the age of the child.

In the case of *Mowery v. Central City Ry. Co.* 51 N. Y. 666, the court said:

"The old, the lame, the infirm or the young are entitled to have their condition and ability, mental and physical, considered in diminution of the degree of care exacted of them."

The rule is, however, laid down by Shearman & Redfield on the Law of Negligence, § 73, as follows:

"It is now settled by the overwhelming weight of authority that a child is held, so far as he is personally concerned, only to the exercise of such degree of care and discretion as is reasonably to be expected from children of his age."

Another point made by the appellant is that it was not allowed to show that the accident was caused by the negligence of the parent. This being an action

35—13 WASH.

brought for the benefit of the child, and not for the benefit of the parent, the negligence of the parent cannot be imputed to the child.

The only remaining question is as to the amount of the judgment recovered. It is contended by the appellant that the amount of the verdict is excessive, showing prejudice and passion on the part of the jury. We are not willing to say that $15,000 will more than recompense the plaintiff for hobbling through life maimed and disfigured. We are aware that many courts have held in similar cases that the amount of this verdict was excessive, but we think it probable that if such injuries had happened to the judges themselves, or to members of their families, their views as to excessive damages would have undergone a radical change.

The judgment will be affirmed.

SCOTT and GORDON, JJ., concur.

HOYT, C. J. (*dessenting*).— I feel compelled to dissent from what is said in the foregoing opinion as to the effect of the railroad company's allowing, if it did allow, persons to travel along and across its right-of-way. In my opinion railroad companies occupy the same relation to the real estate which they own as other owners of such property. The general rule that an owner of uninclosed real estate will lose no rights by reason of the fact that he allows a path to be made across it without objection on his part, is too well settled to require the citation of authorities in its support. The plaintiff's own evidence in the case at bar showed that the right-of-way of the appellant, along and across which persons had been accustomed to pass, was open to the common and entirely uninclosed. Hence, under the general rule above stated, the railroad

company could lose no rights by reason of persons having been allowed to travel upon it, even if it was shown that the highest officers of the company had full knowledge of their custom so to do.

Upon the other questions discussed I express no opinion.